UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DONNA ROWE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:09-cv-182-DBH |
| | ) | |
| THE AROOSTOOK MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Donna Rowe commenced this civil action against her former employer, the Aroostook

Medical Center, alleging failure to accommodate her disability and disability discrimination

under Maine and federal law.  Rowe's Maine-law count includes a claim of whistleblower

retaliation as well.  When Rowe commenced this litigation she was still an employee of the

Aroostook Medical Center.  She was terminated during the discovery phase of this litigation, but

does not seek to pursue a termination-related claim at this time.  The Aroostook Medical Center

has filed a motion for summary judgment against all pending claims.  The Court referred the

motion for report and recommendation pursuant to 28 U.S.C. § 636(b).  Based on my review of

the summary judgment record, I recommend that the Court grant the motion with respect to

Rowe's discriminatory/retaliatory/whistleblower failure to hire claim(s) and deny the motion

with respect to Rowe's claim that the Aroostook Medical Center failed to reasonably

accommodate her disability.

**MATERIAL FACTS**

The following factual statement is drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). The underlying statements are found in the Defendants Statement of Material Facts ("DSMF," Doc. No. 20), the Plaintiff's Opposing Statement ("POS," Doc. No. 40), the Plaintiff's Additional Statement ("PAS," Doc. No. 41), and the Defendants' Reply Statement ("DRS," Doc. No. 48).

Rowe began working for the Aroostook Medical Center as a registered nurse in May 2003. Rowe originally worked for several weeks in the Rehabilitation Unit. She then trained in the Medical/Surgical Unit where she remained into 2006. In early 2005, Rowe began to seek additional employment to supplement her income. The Aroostook Medical Center became aware of this and became concerned because it did not want to lose Rowe. On February 17, 2005, Lynn Turnbull, Vice President of Nursing, sent Rowe a note stating that she heard about Rowe seeking alternative employment and requesting that Rowe speak to her before deciding to take other employment because she was a valuable employee.

In August 2005, Rowe injured her left arm at work and developed adhesive capsulitis ("frozen shoulder syndrome"). Rowe was able to return to work quickly with the restriction of

not lifting more than 20 pounds or reaching overhead.[1] (DSMF ¶¶ 1-3, 5; POS ¶ 3; PAS ¶¶ 1-5.) The presence of a qualifying disability is not challenged at this stage.

During the year following Rowe's injury, the Aroostook Medical Center gave Rowe various temporary assignments,[2] filling in for other nurses on the Medical/Surgical floor, where she worked prior to her injury. (DSMF ¶7.) The first factual contest involves a March 3, 2006, directive from Robin Corson, Medical/Surgical Nursing Supervisor, instructing Rowe to pass medications to 15 or 18 patients. There is a swearing contest between Rowe and Corson about whether Rowe could comply fully with this directive and remain within her lifting restriction. (DSMF ¶¶ 10, 12; POS ¶¶10, 12.) Rowe complained to Corson about the directive, telling her it was unsafe for the patients and that she could not perform the task because it would impact patient safety. (PAS ¶ 11.) There is also a swearing contest between Rowe and Corson about how Rowe raised her objection, either rudely or just firmly. (DSMF ¶ 11, POS ¶ 11.) The briefs do not suggest that the distinction is material. Corson sent Rowe to the human resource office to address the matter with Sherry Hitchcock, a human resources officer. (DSMF ¶ 14.) There is a swearing contest about whether a compromise was reached that Rowe should perform the task with respect to only those patients who did not require lifting. Corson says Rowe was insubordinate in failing to fully comply. Rowe says it was a reasonable compromise proposed by, and backed by, the other nurses on the floor and accepted by Corson. (DSMF ¶¶ 17-18; POS ¶¶ 17-18.) Rowe relates that, prior to this incident, Corson had assigned Rowe to take care of "walky talkies," meaning patients who could ambulate and perform self care. (PAS ¶ 14.)

[1] Rowe also has degenerative joint disease of the cervical spine and a herniated cervical disk. (DSMF ¶ 4.) (DSMF ¶4.) It is not indicated that this condition has any relationship to her departure from work in August 2005 or her 20-pound lifting restriction.

[2] The "various temporary assignments, filling in for other nurses" description is drawn from HR Officer Hitchcock's affidavit. Rowe's testimony is also cited, but is to the effect that she remained on the floor doing various assigned tasks, which is presumably what other nurses were doing as well.

However, after the medication incident, Corson began to assign Rowe to care for patients who required lifting beyond Rowe's restriction. (PAS ¶ 15.) The Aroostook Medical Center does not dispute this fact, but offers a qualification that Rowe could have sought assistance from other nurses when lifting was required. (DRS ¶ 15.[3]) The Aroostook Medical Center also admits Rowe's statement that Corson "constantly pressured Rowe to seek employment someplace else." (PAS ¶18; DRS ¶ 18.)

The next swearing contest introduces testimony from Barbara Ireland, a fellow nurse whose work relationship with Rowe was not amicable. The Aroostook Medical Center enlists Ireland to join Corson in a chorus about how frustrating it was to work with Rowe and how Rowe refused to perform tasks due to her physical restriction, although the only task that is specified in the Defendant's Statement is the "passing medications" task. (DSMF ¶¶ 19-20.) In March 2006, Ireland voiced rather harsh assessments about Rowe's restrictions, calling her "useless" and saying she was not needed. (DSMF ¶ 21.) Ms. Corson disciplined Ireland for clearly inappropriate behavior. The Aroostook Medical Center makes it plain in its Statement that Corson gave Ireland some allowance for frustration. (Id. ¶¶ 24-25; DRS ¶ 24.)

In August 2006, Corson, HR Director Thomas Umphrey, and VP of Nursing Lyne Turnbull decided that Rowe could not work on the Medical/Surgical floor anymore, ostensibly because of an inability or unwillingness to perform "many essential functions" of the position.[4]

---

[3]     Unless otherwise indicated, references to paragraphs in the Aroostook Medical Center's Reply Statement are to the paragraphs corresponding with Rowe's Statement of Additional Facts.

[4]     Rowe contests the statement that she could not perform essential functions in her Opposing Statement of Material Facts. She offers an affidavit stating that she could perform all of the essential tasks of the job. (PAS ¶ 6.) This assertion is at odds with her complaint, which alleges: "At some point after Ms. Rowe injured her shoulder she became unable to perform some of the essential functions of the position she held in the Med-Surg Unit." (Compl. ¶ 10.) Nurse Corson declares in support of the Aroostook Medical Center's Reply Statement that Rowe's lifting restriction prevented her from hanging I.V. bags overhead. (DRS ¶ 6.) Aroostook Medical Center previously offered only a conclusory statement that Rowe could not perform many essential functions, without itemizing functions essential to the post that Rowe could not perform. The evidence does not indicate an inability to lift an

(DSMF ¶ 27.)  This decision came about one year after Rowe suffered her injury.  Thereafter, for a period of time between August 2006 and January 2007, the Aroostook Medical Center paid Rowe to cover in a Hematology/Oncology Clinic for another nurse on leave.  (DSMF ¶¶ 29-31; POS ¶¶ 29-31.)

The Aroostook Medical Center's motion for summary judgment is premised on the next placement.  According to the Aroostook Medical Center, any and all duty it may have had to accommodate Rowe ended when it offered her a new position in January 2007 that did not require an RN license and imposed more onerous travel requirements.  (Mot. at 6-7.)  Rowe contends that the Aroostook Medical Center was making an RN position for her and the position was therefore covered by a collective bargaining agreement, but that the Aroostook Medical Center refused to provide her benefits associated with the CBA and then dissolved the position entirely, ostensibly based on a funding issue.  (Opp'n Mem. at 4.)  The factual offerings reflect a month-long effort to achieve a mutually acceptable arrangement in connection with a "Medical Assistant" job for Horizons Health Services, which has health centers in Presque Isle, Mars Hill, Fort Fairfield, Washburn, Limestone, and Madawaska.  These efforts included an attempt on the part of Rowe's union to enforce a collective bargaining agreement in connection with the assignment, with the Aroostook Medical Center refusing to treat the position as covered by the CBA.  Mr. Umphrey swears the CBA did not apply.  Rowe swears it did.  It is undisputed that

---

I.V. bag with the right arm or that an I.V. bag weighs in excess of twenty pounds.  Also, as is elsewhere related, the Aroostook Medical Center has allowed that, when other nurses are around, lifting tasks can be reassigned.  (DRS ¶ 15.)

Rowe's claims are not premised on her removal from Medical/Surgical.  Rowe's complaint and her memorandum of law allege failure to accommodate and discriminatory hiring decisions in relation to Rowe's attempt to fill other positions.  It appears that Rowe has abandoned any claims associated with her removal from Medical/Surgical based on a failure to pursue them in a timely fashion in the administrative forum.  The Commission Investigator's Report asserts that Rowe's timely allegations reach back only so far as May 10, 2007.  (Doc. No. 43-1 at 1.)  However, this is not stated by either party.

the union took up the cause. The record does not allow a reliable conclusion to be drawn on the CBA question. In any event, the negotiations never resulted in an agreement due to issues over classification (RN or CNA), travel, pay, and orientation provisions and the position was withdrawn in February 2007. (DSMF ¶¶ 32, 34-36, 44-51; POS ¶¶ 32, 34-36, 44-51.)

At this juncture, the Aroostook Medical Center took the position that there was no suitable RN job available for Rowe. (DSMF ¶ 52.) Rowe applied for worker's compensation. The Aroostook Medical Center opposed that effort, reporting that Rowe refused suitable work. (DSMF ¶ 53.) Rowe then applied for unemployment compensation. (DSMF ¶ 58.) The Aroostook Medical Center then informed the Maine Bureau of Unemployment Compensation that Rowe was on worker's compensation because the Aroostook Medical Center (allegedly) did not have a modified duty position for her. (DSMF ¶ 59.) Rowe eventually received unemployment benefits after a Department of Labor investigation and an April 2007 finding that the Aroostook Medical Center laid her off. (POS ¶ 61; PAS ¶¶ 30-31.) Internally, HR classified Rowe as being on worker's compensation leave rather than as laid off or terminated. (DSMF ¶ 62; POS ¶ 62.) Rowe alleges a malign purpose. (PAS ¶ 28.) The Aroostook Medical Center says the leave classification preserved Rowe's employee status and her benefits. (DRS ¶ 28.)

The Aroostook Medical Center offered new work to Rowe in late March 2007: a temporary placement covering for a nurse in the Radiology Department, a position that the Aroostook Medical Center describes as within Rowe's medical restrictions. (DSMF ¶ 67.) This was a part-time position, but Rowe returned to full-time employment because she divided her time between filling in for the absent nurse and also working as a clinical educator for the "I.S. Department." (DSMF ¶ 68.) In these positions Rowe received her R.N. rate of $21.33 per hour. (Id. ¶ 69.) The Aroostook Medical Center showcases this arrangement as proof of its continuing

good faith.  (Mot. at 7-8.)  This arrangement continued through June 2007, when the absent nurse

returned, at which time the Aroostook Medical Center filled the half-time void with clerical work

in medical records.  (DSMF ¶ 74;  PAS ¶ 32.)  From June 2007 through her eventual termination

on March 25, 2010, the Aroostook Medical Center kept Rowe in these two positions (medical

records and I.S. Department) and paid her full-time nurse's pay.  (DSMF ¶ 75-76.)

     The Aroostook Medical Center asks the Court to find, as a matter of law, that these

employment opportunities were good enough to count as reasonable accommodation,

particularly as Rowe continued to receive her pre-disability hourly rate of pay.  (Mot. at 10;

DSMF ¶ 76.)  On the issue of pay, Rowe attests that the employment provided to her meant that

she did not receive consistent overtime, shift differentials, or bonus shifts as did other registered

nurses.  (POS ¶ 76.)  Rowe also argues that she was never given an appropriate reassignment,

leaving her to apply for different positions that were consistently denied her for one reason or

another, without any intervention by the employer to provide reassignment to an equivalent

position.  (Opp'n Mem. at 4-5.)

     Between April 2007 and February 2008, the Aroostook Medical Center declined to hire

Rowe for more than 10 different positions[5] that Rowe sought through a competitive application

process (without receiving any accommodation/reassignment preference).  (DSMF ¶¶ 77.)  This

brings us to a new chapter in the factual contest, which includes evidence related to the demands

of certain nursing stations and the relative qualifications of Rowe and other applicants.  The

Aroostook Medical Center says the ability to lift weights beyond Rowe's capacity was an

---

[5]    Most, but not all of the positions were nursing positions.

essential function of several positions she sought.  (Mot. at 10, 25.)  The others, says the

Aroostook Medical Center, were filled with applicants who were more qualified.  (Id. at 11, 25.)

Of these positions, Rowe states that the Maine Human Rights Commission found that she should

have been offered one of four in order to reasonably accommodate her disability.  With respect

to most of the following jobs, the Aroostook Medical Center offers a declaration from the

relevant hiring decisionmaker that he or she had no awareness of Rowe's protected status either

as someone with a disability or as someone who engaged in protected activity.  Rowe's response

in each instance is to note that the Human Resources Department knew of her status.  Also, as

Rowe emphasizes, Human Resources kept tabs on who the applicants were, as is demonstrated

by evidence introduced by the Aroostook Medical Center.  In certain instances the decisionmaker

also knew of Rowe's protected status.

*Nurse Educator, Infection Control*

In April 2007, while Rowe was covering for an absent nurse in radiology and performing

clinical educator services for the I.S. Department, she applied for the position of Nurse Educator,

Infection Control (07-0656), another part-time position.  (DSMF ¶¶ 78-79.)  Rowe observes that

she had a Bachelor of Science in Community Health Education and was an internal candidate,

unlike the successful candidate.   Rowe also cites reliable evidence that the HR Department

screened applicants, so it was no secret to the Aroostook Medical Center that Rowe was seeking

the position.  (POS ¶¶ 80, 87.)  The Aroostook Medical Center explains that the decisionmaker

decided not to interview anyone other than the first interviewee because that person, an outside

hire, was so experienced.  (DSMF ¶ 84.)

*Diabetes Nurse Educator*

In June 2007, the month in which the radiology nurse returned, Rowe applied for the position of Diabetes Nurse Educator, Educational Services & Programs (07-1267).  The decisionmakers interviewed Rowe and three others and, according to one decisionmaker, Rowe was the second choice, losing out to a more qualified applicant who had been a manager at the Aroostook Medical Center in the past with years of experience as a nurse educator and prior experience in a dialysis unit.  (DSMF ¶¶ 101-105.)  By way of comparison, Rowe also had experience in nursing and nurse education, but more experience in hematology/oncology.  (POS ¶ 105.)  The Aroostook Medical Center states that interview performance was also a factor.  (DSMF ¶ 106.)

*RN, Horizons Health Services Surgical Services*

Also in June 2007, Rowe applied for the position of RN, Horizons Health Services Surgical Services (07-1219).  The decisionmakers interviewed only one applicant who was internal to their department, had both operating room and office experience, and was familiar to and liked by the relevant surgeons and staff.  (DSMF ¶¶108-112.)  Rowe responds that she was also familiar, having worked in that office, and that she had excellent customer service skills and excellent medical and related surgical experience.  (POS ¶¶ 111-112.)

*Phlebotomist, ARG Lab/Chemistry*

In August of 2007, Plaintiff applied for the position of Phlebotomist, ARG Lab / Chemistry (07-2018).  (Rowe Dep. at 144.)  Rowe was not interviewed.  (PAS ¶ 58.)  According to the declaration of the decisionmaker, she did not consider Rowe because Rowe indicated a desire for full-time work and the position was part-time.  (DSMF ¶¶ 115-118.)  As it happens, however, the successful candidate also sought full-time work on her application.   (POS ¶ 117.)

Rowe also attests that the position was advertised as full-time. (POS ¶ 118.) The Aroostook Medical Center does not suggest that the successful candidate was more qualified, rather that she was "ideal" due to medical lab training and experience as a phlebotomist. Also, the Aroostook Medical Center explains that the decisionmaker knew the successful candidate would be willing to take part-time employment. (DSMF ¶ 120.) Rowe responds that the successful applicant was not an RN or a current employee and that Rowe also was a trained phlebotomist. (POS ¶ 121.)

*RN, OR, ARG Operating / Recovery Room*

Also in August of 2007, Plaintiff applied for the position of RN, OR, ARG Operating / Recovery Room (07-2006). This time, the decision maker (VP of Nursing Turnbull) clearly understood Rowe's protected status. (Rowe Dep. at 145.) However, the Aroostook Medical Center emphasizes an essential qualification of lifting 50 pounds or more and a preference for individuals with operating room experience. (DSMF ¶¶124-127, 131.) Turnbull also declares that she did not consider Rowe for the position because Rowe did not have any previous operating room experience. (DSMF ¶ 130.) Rowe reports receiving a rejection letter from HR the day after submitting her application. (POS ¶ 128.) The Aroostook Medical Center does not offer testimony from anyone in HR suggesting that HR screened her application based on a lifting requirement.

*RN, Horizons Health Services Surgical Services*

Also in August 2007, Rowe applied for the position of RN, Horizons Health Services Surgical Services (07-1941). The decisionmaker's declaration states that she interviewed four of twelve applicants, not including Rowe, two of whom had "office or emergency room experience," another who previously worked in the Aroostook Medical Center's operating room, and a final candidate who had prior surgical office experience and had assisted

10

with surgical office procedures. (DSMF ¶¶142-145.) The last candidate received the job. (Id. ¶146.) According to the decisionmaker, she passed over Rowe because Rowe lacked "specialty office experience" and had only "fair" customer services skills. (Id. ¶ 147.) Rowe responds that she had already trained for work in this very surgical office, had more experience caring for post-surgical patients and had been evaluated at the Aroostook Medical Center as having excellent customer service skills. (POS ¶ 147.) Rowe also attests that Human Resources rejected her application the day after she submitted it. (POS ¶¶145-146; Decl. of Donna Rowe ¶ 22, Doc. No. 40-1.)

*RN, ARG Rehab Unit*

In September 2007, Rowe applied for the position of RN, ARG Rehab Unit. The decisionmaker in this instance was Rowe's former nemesis, Barbara Ireland, now a "Senior Manager" for the unit. (DSMF ¶ 150.) The Aroostook Medical Center offers a declaration from Barbara Turner, a "recruiter" within the Aroostook Medical Center. Turner declares that one of her job responsibilities is to review internal applications and screen out applications where the applicant does not meet the minimal requirements of the position. (Turner Decl. ¶ 1.) Turner explains that the Rehab position required lifting of up to 50 pounds and that she proactively weeded out Rowe's internal application on the ground that Rowe could not engage in that kind of lifting activity. (Id. ¶ 3.) Turner's Declaration includes a revelation that the number of staff on duty has a direct bearing on whether or not lifting 50 or more pounds is an essential function of the job. (Id. ¶ 3.) If there is only one RN and one CNA on duty at a time, "no matter how many patients there are, both individuals staffing the unit must be able to meet the lifting requirements." (DSMF ¶ 152.) The Aroostook Medical Center does not offer any testimony

from a recruiter explaining why Rowe was not screened out of the applicant pool for the RN position Ms. Turnbull filled in August 2007 (RN, OR, ARG Operating / Recovery Room, *supra*).

*RN, Horizons Cardiology*

In October 2007, Rowe applied for the position of RN, Horizons Cardiology (07-2471). She was not interviewed.  (PAS ¶ 64.)  The decisionmaker for this position was the same decisionmaker for the RN Horizons Health Services Surgical Services position.  She declares that she hired someone who had been her second choice for the earlier opening.  The explanation is that the successful applicant had paramedic and emergency room experience, as well as excellent customer service skills, was a 20-year employee of the Aroostook Medical Center, and was a "perfect fit" for the position.  (DSMF ¶¶ 155-161.)   Rowe attests that the decisionmaker reported passing over her because she lacked specialty office experience.[6]  (PAS ¶ 65.)

*Nurse Educator, Infection Control*

In February 2008, Rowe applied for the position of Nurse Educator, Infection Control (07-3009).  The decisionmaker interviewed only one of five applicants and maintains that she was unaware of Rowe's application because she never checked to see if any online applications were submitted.    (DSMF ¶¶ 163-168.)  Rowe reports her familiarity with all of the documents produced in the administrative process and states that the successful candidate did not have training as an educator and did not have experience with infection control.  (PAS ¶ 71.)  The decisionmaker was the same decisionmaker who hired for the nurse educator, infection control position in April 2007.  (DSMF ¶ 78.)

---

[6]        Rowe's Second Affidavit suffers from significant typographical errors in that numerous paragraphs are incomplete.  Rowe's Additional Statement reports that the decisionmaker also regarded her customer service skills as poor, but her affidavit omits this statement and, therefore, cannot support it.  (See Doc. No. 41-1 ¶ 10.)

*I.S. Clinical Educator*

In February 2008, Rowe applied for the position of I.S. Clinical Educator.  The decisionmaker chose someone else, but Rowe was interviewed.  According to the decisionmaker, Rowe did not perform as well in the peer interview process as the successful applicant and there was concern because Rowe, who had worked in the department before, had demonstrated an alleged "recurring issue with lack of organizational skills when teaching classes."  The Aroostook Medical Center says the decisionmaker did not know of any protected activity, but it does not state that he was unaware of a disability issue.  (DSMF ¶¶ 169-173, 177.)  Rowe responds that she and the other applicants all received the same score in the peer review for organizational skills.  (POS ¶ 173.)

*Other Developments*

On October 19, 2007, Rowe filed a charge against the Aroostook Medical Center with the Maine Human Rights Commission, challenging the decision not to give her any of the positions she sought.  (DSMF ¶ 178.)  The date of this filing precedes Rowe's application for Nurse Educator, Infection Control and I.S. Clinical Educator.  The summary judgment statements do not clarify whether this filing predated Rowe's application for RN, Horizons Cardiology.

In May 2008, the Aroostook Medical Center placed Rowe at Crown Ambulance for two days per week, where she made coffee, washed dishes, filed papers, answered the phone, and swept and mopped in a position the Aroostook Medical Center labels "Administrative Assistant."  (PAS ¶¶ 84-85;  DRS ¶ 85.)  At this time Rowe also continued to work as an educator in the I.S. Department two days of the week and she did some chart review work and filled out call-back sheets on the Medical/Surgical floor one day of the week.  (PAS ¶ 86.)

To support her claims, Rowe seeks to offer findings made in the Investigator's Report prepared on behalf of the Maine Human Rights Commission. (Doc. No. 43-1.) The Report contains findings and a recommendation executed by both Chief Investigator Barbara Lelli and Executive Director Patricia Ryan. The finding that there exists probable cause to believe that the Aroostook Medical Center violated Rowe's rights does not relieve Rowe of the obligation to present evidence in support of her claims in this Court.

I end the factual recitation there, omitting more than 120 statements offered by the Aroostook Medical Center in relation to additional reassignments imposed in and after December 2007 and in relation to various workplace conduct by Rowe, some of which is cited in support of the Aroostook Medical Center's decision to terminate Rowe's employment in March 2010. Rowe is not asserting a discriminatory or retaliatory discharge claim in this civil action and is currently pursuing her discharge-related claim(s) administratively.

I have declined to write up my evidentiary rulings on a host of requests to strike that are advanced by the Aroostook Medical Center in its reply statement. In many instances, I find that the Aroostook Medical Center is fighting over characterizations of facts that are not even material to the legal issues the Court must address to resolve the motion. The Aroostook Medical Center's approach to its Local Rule 56 submissions lacks, shall we say, surgical precision. Nevertheless, there are two evidentiary issues that deserve comment.

The Aroostook Medical Center offers numerous statements to the effect that individual decisionmakers had "no knowledge of any complaints Plaintiff had registered with [the Aroostook Medical Center] or regarding [the Aroostook Medical Center] involving any violation of any law or implicating any threat to health or safety." (DSMF ¶¶ 85, 90, 98, 107, 114, 123, 141, 148, 162, 177.) To these statements Rowe simply responds that the Aroostook Medical

14

Center's Human Resources Department "knew of [her] protected activity." Rowe supports her opposition with her own affidavit. (Decl. of Donna Rowe ¶13, Doc. No. 40-1.) It does not appear that she ever deposed any of the decisionmakers in question about any particular protected activity in question. I conclude that the Aroostook Medical Center Human Resources Department had knowledge of Rowe's "protected activity." Where that will take Rowe in regard to her discrimination and retaliation claims will depend on the facts of record and on the merits of the legal theories Rowe advances in her opposition memorandum.

Rowe also offers evidence that the Human Resources Department prescreened applicants to the various positions. It is difficult to fault Rowe for this. The evidence is offered by the Aroostook Medical Center as well, albeit in relation to only one job and in support of a statement that Human Resources concluded that Rowe could not perform the essential functions of one particular position.[7] The simple fact of involvement by Human Resources is in the record and cannot be ignored. I have recognized it and agree with Rowe that a reasonable inference is that the Human Resources Department was aware of all of her application activity. Where that limited inference takes Rowe is a merits issue that will have to be discussed in the context of the legal theories she advances in her opposition memorandum.

### DISCUSSION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the

---

[7] As it happens, HR exerted itself in connection with the one application that might have allowed Ms. Ireland an opportunity to interview Rowe.

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If the facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

## A.    Reasonable Accommodation

Rowe's accommodation claim is advanced under both the Maine Human Rights Act and the Rehabilitation Act. In her complaint, Rowe alleges an inability to perform some of the essential functions of her post in Medical/Surgical nursing, and that the Aroostook Medical Center failed to accommodate her when it failed to reassign her to an equivalent nursing position. (Compl. ¶¶ 10, 16, 23.) In its motion for summary judgment, the Aroostook Medical Center argues that "it reasonably accommodated [Rowe] at all times, even if it did not offer [her] the accommodation of her choice." (Mot. at 4.) It further argues that any obligation to accommodate Rowe ceased after she "refused to accept the terms and conditions of the Horizons' [Medical Assistant] position." (Id.) From this point forward, says the Aroostook Medical Center, it had no duty to accommodate Rowe's return to nursing because it had already made a reasonable-enough offer. (Id.) Observing (without irony) that it continued to "reasonably accommodate" her, in any event, it argues that Rowe was never entitled to fill new nursing vacancies because it has a competitive application process that trumps any preferential

reassignment.  (Id. at 11-14.)  Finally, the Aroostook Medical Center argues that its good faith

efforts foreclose a damages remedy under the Rehabilitation Act even if there is a genuine issue

as to the reasonableness of its efforts.  (Id. at 4.)

The Rehabilitation Act prohibits recipients of federal financial assistance from excluding

otherwise qualified individuals with disabilities from participation in programs, denying benefits

to such individuals, or subjecting them to discrimination under any program or activity receiving

the financial assistance.  29 U.S.C. § 794.  In addition to prohibiting these activities, the

Rehabilitation Act also imposes an affirmative duty on employers to provide reasonable

accommodation to disabled employees who are qualified to fill a position, with or without

reasonable accommodation.  Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 19-20

(1st Cir. 2004).  Rowe alleges that these legal duties apply to the Aroostook Medical Center with

respect to her employment because the Aroostook Medical Center is a recipient of federal

financial assistance.  (Compl. ¶ 22.)  The Maine Human Rights Act affords analogous protection

to Rowe.  The MHRA prohibits disability discrimination in employment, 5 M.R.S. § 4572, and

defines discrimination to include failure to make reasonable accommodations for the known

physical or mental limitations of an otherwise qualified individual with a disability, whether the

individual is an applicant or an employee.  5 M.R.S. § 4553(2)(E), (F).

Four elements govern the analysis of a summary judgment motion challenging a failure-

to-accommodate claim:  (1) whether the plaintiff is a qualified individual with a disability under

the applicable statute;  (2) whether the employer is subject to the statute;  (3) whether the

employer, despite knowing of the employee's physical or mental limitations, did not reasonably

accommodate those limitations;  and (4) whether the employer's failure to do so affected the

terms, conditions, or privileges of the plaintiff's employment.  Higgins v. New Balance Athletic

Shoe, Inc., 194 F.3d 252, 264-65 (1st Cir. 1999); Carmichael v. Verso Paper, LLC, 679 F. Supp. 2d 109, 132 & n.22 (D. Me. 2010). When it comes to the burden of proof on the issue of what constitutes a reasonable accommodation, a plaintiff/employee needs to show that a proposed accommodation would "effectively enable her to perform her job" and also that it is reasonable on its face, something that would ordinarily be considered feasible for the employer under the circumstances. Reed v. Lepage Bakeries, Inc., 244 F.3d 254, 259 & n.5 (1st Cir. 2001). If the plaintiff makes this showing, "the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details." Id. at 259.

### 1. "Preferential" reassignment

The Aroostook Medical Center's primary summary judgment argument is that it was appropriate to make a non-nursing position at Horizons available to Rowe in January 2007 to accommodate her disability but to treat her as a competitive applicant for any and all nursing positions she might seek thereafter, without any preferential consideration for a reassignment that would return her to RN status. I address the later portion of this argument first, the idea that preferential reassignment is not available as a matter of law under either federal or state law, and conclude that a request for noncompetitive reassignment to an equivalent position within one's qualifications could be deemed reasonable in many circumstances under both federal and state law.

Federal law and Maine law are analogous with respect to the definition of "reasonable accommodation." Among other possible definitions, both federal and state law provide that a reasonable accommodation "may include" both "job restructuring" and "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B); 5 M.R.S. § 4553(9-A)(B). With respect to job

restructuring, the law in this Circuit reflects that an employer is not required to restructure a job in a way that modifies or removes an essential function. Calef v. Gillette Co., 322 F.3d 75, 86 n.8 (1st Cir. 2003). In effect, if restructuring requires modification of an essential function, then the employee is not a qualified individual and there is no duty to accommodate. Id. Rowe does not insist upon any restructuring. She contends, instead, that she should have been reassigned to a nursing post where lifting in excess of 20 pounds is not an essential function. The Aroostook Medical Center argues that preferential reassignment to an equivalent post is not actually required by Maine or federal law and that an employer is free to direct an employee to an available job of lesser status that is easier to fill, especially if it continues to provide the same pay, and then treat that employee as a competitive applicant for other job openings that would return the employee to her former status. (Mot. at 7-10, 11-13.)

In US Airways, Inc. v. Barnett, 535 U.S. 391 (2002), the Supreme Court considered whether a requested reassignment accommodation was reasonable on its face, as in an accommodation that should apply "ordinarily or in the run of cases," where it would "trump" an established seniority system Id. at 402-403. The Court held that, to the contrary, an established seniority system ordinarily should trump a reassignment request, meaning that a request for such a reassignment will not, on its own, satisfy the plaintiff's burden of demonstrating a reasonable accommodation request. Id. at 403. However, the existence of an established seniority system was pivotal in US Airways. The Court flatly stated that "normally" reassignment "would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system." Id. at 403. Although the seniority system in U.S. Airways was not collectively bargained for and was unilaterally imposed by the employer, the Court held that the distinction was not material. This was so, in the Court's view,

because an established seniority system, bargained-for or not, "provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment," provides an element of due process and fairness to senior employees, and encourages employees to invest in the company over the long haul. Id. at 404.

According to the Aroostook Medical Center, it has an established system of hiring nurses through a competitive application process and, therefore, any request for a preferential reassignment by a nurse that would preserve nurse status is not reasonable in the ordinary case, even if the job would go to an outside candidate. In support of this position, the Aroostook Medical Center asserts that Rowe was not the most qualified applicant for certain nursing positions for which she could perform all essential functions. (Mot. at 11.) In effect, the Aroostook Medical Center is proposing a hard-and-fast legal rule that would foreclose reassignment as a reasonable accommodation if a defendant can attest, through a suitable employee, to the existence of a uniform (or perhaps customary) policy of hiring the most qualified applicant for a job posting, and the plaintiff is unable to produce evidence to the contrary.[8] In support of this proposition, the Aroostook Medical Center cites Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 483-84 (8th Cir. 2007), reh'g denied, 493 F.3d 1002 (2007), cert. granted, in part, 128 S. Ct. 742 (2007), and cert. dismissed, 2008 U.S. Lexis 1095 (Jan. 14, 2008), EEOC v. Humiston-Keeling, Inc., 227 F.3d 1024 (7th Cir. 2000), and Daugherty v. City of El Paso, 56 F.3d 695, 700 (5th Cir. 1995), reh'g denied, 1995 U.S. App. Lexis 25619, cert. denied, 1996 U.S. Lexis 1775. (Mot. at 11-12.) The Aroostook Medical Center also concedes the existence of a split in the circuits, citing Smith v. Midland Brake, Inc., 180 F.3d 1154, 1167

---

[8] The discovery implications of such a rule are troubling insofar as there is general resistance to permitting discovery into the qualifications of other employees or applicants with respect to jobs other than the job or jobs that are actually the subject of the parties' dispute.

(10th Cir. 1999) (en banc) (noting that, "if a disabled employee had only a right to require the employer to consider his application for reassignment but had no right to reassignment itself . . . then this promise within the ADA would be empty").  The competing rationales are well stated in <u>Humiston-Keeling</u> and <u>Smith</u>.  To my view, the *en banc* opinion in <u>Smith</u> is better reasoned, more thorough, and actually adheres to both the plain meaning and the congressional purpose behind the statutory language at issue.[9]

The facts are undisputed that Rowe was qualified to perform the essential functions of some of the nursing positions she sought and there is no suggestion that placing her in one of the jobs would have imposed a hardship on the Aroostook Medical Center.  Additionally, the record does not suggest that Rowe's qualifications were merely minimally sufficient or that she was up against vastly superior candidates.  The presentation simply is not so one-sided.  Nor does the record reflect a consistent approach to thoroughly vetting all of the applicants to a position to ensure the superior candidate will be retained.  The Aroostook Medical Center is attempting to win on this argument without fully shouldering its burden of proving the existence of a consistent competitive application system.  Although it asserts that Rowe lost out to others in

---

[9]    The <u>Humiston-Keeling</u> case had a powerful flavor of a reassignment amounting to a promotion and it also involved competition from within the organization for a "coveted" job considered "generally desirable" and actively sought-after by existing employees, 54 F. Supp. 2d 798, 816-17 & n.1 (N. D. Ill. 1999) (order on mot. to reconsider), 54 F. Supp. 2d 798, 804 (N. D. Ill. 1999) (orig. order on mot. for summary j.), though the Seventh Circuit panel decision left no room for these circumstances to be weighed.  In <u>Huber</u>, the Court adopted the reasoning of <u>Humiston-Keeling</u> without elaboration.  486 F.3d at 483-84 (reversing district court). The Eighth Circuit concluded that reassignment from a grocery order position to a janitorial position was reasonable enough accommodation.  <u>Id.</u> at 481.  There was no suggestion in the district court's decision that the employee was made to compete for that demotion, which entailed a 50 percent cut in pay, though the employee was expected to compete for an equivalent position.  No. 04-2145, 2005 WL 3690679, *2, 2005 U.S. Dist. Lexis 40251, *20 (W.D. Ark. Dec. 7, 2005).  The District Court reversed by the Eighth Circuit in <u>Huber</u> took some guidance from <u>US Airways</u>, observing that the Supreme Court rejected the premise that there can be no preferential treatment of disabled employees when it comes to accommodation.  No. 04-2145, 2005 WL 3690679, *4, 2005 U.S. Dist. Lexis 40251, *13-14.  Finally, <u>Daugherty</u> involved municipal employment, a city charter that gave priority to full-time employees seeking transfer, and a plaintiff who was a short-term, part-time employee, which is a significant distinguishing factor. 56 F.3d at 699.  Also, the Fifth Circuit held that the accommodation claim could not go forward based on a lack of evidence of disparate treatment.  <u>Id.</u> at 700.  Disparate treatment is not required to support a failure to accommodate claim.  <u>Garcia-Ayala v. Lederle Parenterals, Inc.</u>, 212 F.3d 638, 646 n.10 (1st Cir. 2000).

competitive scenarios, none of its statements of material fact represents that a competitive application process is enshrined in a policy or even that it has been consistently employed with respect to nurses, either in or outside of the disability accommodation context. For example, there is no statement to the effect that current employees are never preferred over outside applicants with greater qualifications. I conclude on this record that the Aroostook Medical Center fails to demonstrate the existence of an established hiring system that would trump reassignment of a disabled nurse to another nursing post for which she would be a qualified applicant.

### 2. *The limits of reasonableness*

The Aroostook Medical Center argues that any duty to accommodate Rowe "ended when Plaintiff refused to accept on [the Aroostook Medical Center]'s terms the reasonable accommodation of reassignment in January of 2007." (Mot. at 6.) This is the medical assistant position involving more onerous travel requirements and a union objection related to CBA coverage.

As the Aroostook Medical Center maintains, an employer is not required to offer an employee the best possible accommodation or the accommodation the employee requests. The employer may choose among effective accommodations and the employee cannot refuse a reasonable accommodation and still be considered a qualified individual. These propositions are supported by EEOC regulations designed to implement the equal employment provisions of the Americans with Disabilities Act. 29 C.F.R. §§ 1630.2(o), (p), 1630.9(d). On the other hand, it is also recognized that the "duty to provide a reasonable accommodation is a continuing one [that is] not exhausted by one effort." Ralph v. Lucent Techs., 135 F.3d 166, 172 (1st Cir. 1998). This ongoing duty to help ameliorate the otherwise harsh effect of demoting or terminating an

employee who suffers from a disability that does not disqualify her from equivalent employment can evolve over a period of months. See, e.g., id. (involving 56 weeks of leave where undue hardship was not demonstrated); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647-48 (1st Cir. 2000) ("Even if the request were for an additional five months of unpaid leave, we see no reason to adopt a rule on these facts that the additional medical leave sought would be per se an unreasonable accommodation."); 29 C.F.R. § 1630.2(o)(3) ("It may be necessary for the covered entity to initiate an informal, interactive process" with the disabled employee.). Moreover, the term "vacant position" includes positions that the employer reasonably anticipates "will become vacant in a short period of time," Smith, 180 F.3d at 1175 (quoting Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1187 (6th Cir. 1996)).

The record demonstrates that nursing positions come available with some frequency and that there is frequent need for nurses to cover nursing positions that are temporarily vacant. The temporal gap between Rowe's need for reassignment and the availability of nursing positions she could fill was not a *per se* unreasonably long one. Moreover, the record reflects that Rowe was still on the staff and was filling in during most of the period in question. Given the specific facts of this case, it does not appear that the concept of reasonable accommodation would be stretched beyond the breaking point if the Court permitted the trier of fact to evaluate all of the facts and circumstances and to make its own reasonableness determination. On balance, a trier of fact might find that a good faith effort at accommodation should have resulted in Rowe being allowed to fill temporary nursing vacancies (as she did), take a period of leave (as she did), and be reassigned to an equivalent nursing position. For example, Nurse Educator, Infection Control (April 2007), Diabetes Nurse Educator (June 2007), and RN, Horizons Health Services Surgical Services (June 2007), are all jobs that came available while Rowe was being employed to cover

another nurse's post.[10]  A finding of failure to reasonably accommodate is not compelled by the record, but it is one reasonable assessment of this particular scenario.

### 3.   *Good faith and damages under the Maine Human Rights Act*

The Aroostook Medical Center requests a ruling that its efforts reflect good faith as a matter of law.  This request is tethered to the Maine Human Rights Act, which provides:

> When a discriminatory practice involves the provision of a reasonable accommodation, damages may not be awarded under this subparagraph when the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide that individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

5 M.R.S. § 4613(2)(B)(8)(b).  This language reflects that, under the Maine Human Rights Act, a defendant may not be ordered to pay damages for failure to accommodate when the employer has made good faith efforts.  Showing good faith is the defendant's burden under this provision. By raising a genuine issue as to reasonableness, Rowe succeeds in raising a genuine issue as to the Aroostook Medical Center's good faith as well.

### 4.   *Compensatory damages for emotional harm under the Rehabilitation Act*

Some circuit courts hold that a claim for compensatory damages under the Rehabilitation Act requires a showing of intentional discrimination or actual animus.  <u>Duvall v. County of</u>

---

[10]      The Sixth Circuit observed in <u>Monette</u> that "employers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future."  90 F.3d at 1187. This stands to reason, but the instant case reflects a recurrence of temporary vacancies and a number of new nursing positions, all of which tend to make a more flexible approach more reasonable in this case.  The difficulty with a hard-line ruling foreclosing this possibility as a matter of law is that the Aroostook Medical Center was itself taking additional efforts to accommodate Rowe in April and in June 2007, which tends all the more to suggest that an interactive process was ongoing and that further accommodation was reasonable.

      This Court has previously ruled in favor of a defendant at summary judgment with respect to the reasonableness of a disliked reassignment.  However, in that case the offer of reassignment was to an equivalent position, or at least the plaintiff failed to generate a genuine issue of material fact that her reassignment was not equivalent.  <u>Williams v. Healthreach Network</u>, Civ. No. 99-0030-B, 2000 U.S. Dist. Lexis 9695, *37-39, 2000 WL 760742, *12 (D. Me. Feb. 22, 2000).

Kitsap, 260 F.3d 1124, 1136 (9th Cir. 2001);  Wood v. President & Tr. of Spring Hill Coll., 978

F.2d 1214, 1219-20 (11th Cir. 1992);  Scokin v. Texas, 723 F.2d 432, 440-41 (5th Cir. 1984).

The First Circuit has held that "such damages [are] not available when there [is] no evidence of

economic harm *or* animus toward the disabled."  Fradera v. Mun. of Mayaguez, 440 F.3d 17, 22

n.6 (1st Cir. 2006) (emphasis on disjunctive added) (quoting Nieves-Marquez v. Puerto Rico,

353 F.3d 108, 126-27 (1st Cir. 2003) (citing Schultz v. Young Men's Christian Ass'n of U.S., 139

F.3d 286, 290-91 (1st Cir. 1999)).  In this case Rowe has asserted lost overtime income arising

from the fact that she has not been returned to an equivalent nursing position, where, she attests,

overtime pay and shift differentials are customarily available.  (POS ¶ 76.)  This showing is

sufficient to overcome the legal challenge to compensatory damages under the Rehabilitation

Act, although Rowe has not adduced evidence that the Human Resources Department or a

similar entity or person with authority within the Aroostook Medical Center purposefully failed

to reasonably accommodate her based on animus toward the disabled.[11]

## B.    Discrimination/Retaliation in Hiring

Rowe's disability discrimination / failure to hire claim is advanced under both the Maine

Human Rights Act and the Rehabilitation Act.  Rowe alleges disability discrimination in hiring

in connection with the positions she applied for beginning in April 2007.  (Compl. ¶¶ 17, 24.)

Rowe filed her charge of discrimination with the Maine Human Rights Commission in October

2007.  Rowe also advances whistleblower discrimination or retaliation under the Maine

Whistleblower Protection Act in connection with the same hiring decisions.  (Compl. ¶ 18.)  In

her opposition memorandum she alludes to her objection to passing medications to all patients on

---

[11]    The "intentional" standard may simply require the plaintiff to demonstrate an absence of a good faith effort
to pursue a reasonable accommodation.  Wood, 978 F.2d at 1219-20;  Guckenberger v. Boston Univ., 974 F. Supp.
106, 153 (D. Mass. 1997).

the Medical/Surgical floor and her complaint to Human Resources about representations made to the Department of Unemployment. (Opp'n Mem. at 19.)

All of these claims follow the familiar <u>McDonnell-Douglas</u> flowchart for evaluating the existence of discriminatory or retaliatory motive in cases lacking direct evidence of such motive. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Because the Aroostook Medical Center does not dispute at this time Rowe's protected status under any of the three statutes, I have grouped the claims for purposes of discussion.

In support of its motion for summary judgment on these claims the Aroostook Medical Center asserts that Rowe was not qualified for some positions because of her lifting restrictions and was less qualified than the successful applicant for others. (Mot. at 16.) The Aroostook Medical Center also asserts that several of the decisionmakers were unaware of Rowe's protected status. (<u>Id.</u> at 16-17.) In opposition, Rowe argues that she has sufficiently countered the lack of knowledge challenge because she has submitted evidence that the Human Resources Department "had a significant role in the decision making process," noting that on one occasion Human Resources culled Rowe's application for a position based on an alleged perception that Rowe was unable to perform an essential function of the job. (Opp'n Mem. at 15.) As for the Aroostook Medical Center's legitimate explanations for why others were hired to the nursing positions, Rowe says that she can demonstrate pretext as to five positions. (<u>Id.</u> at 15-18.) The ensuing pretext discussion is limited to those five positions.[12] First I address the issue of decisionmaker knowledge of protected activity.

---

[12] The Aroostook Medical Center's discrimination discussion also addresses termination. This introduces some new issues in the form of four "warnings" made to Rowe about her performance and events the Aroostook Medical Center says justified termination. (<u>Id.</u> at 18.) In opposition, Rowe explains that the instant case does not include a claim for retaliatory or discriminatory discharge because she is now in the process of pursuing that claim administratively. (Opp'n Mem. at 19 n.3.)

## A. *Decisionmaker knowledge of "whistleblower" activity*

With respect to every hiring decisionmaker, the Aroostook Medical Center offers a statement that the decisionmaker had "no knowledge of any complaints Plaintiff had registered with [the Aroostook Medical Center] or regarding [the Aroostook Medical Center] involving any violation of any law or implicating any threat to health or safety."  This statement amounts to an assertion that the relevant decisionmakers were unaware of any whistleblower activity.  Rowe simply responds that the Aroostook Medical Center's Human Resources Department "knew of [her] protected activity."  Rowe supports her opposition with her own affidavit.  (Decl. of Donna Rowe ¶13, Doc. No. 40-1.)  It does not appear that she ever deposed any of the decisionmakers in question about any particular protected activity.  I conclude that the Aroostook Medical Center Human Resources personnel were aware of Rowe's protected activity.  However, Rowe fails to demonstrate that the relevant decisionmakers knew of her protected status as an alleged whistleblower, which undercuts her whistleblower discrimination claim.  Rowe seeks to attribute knowledge to the relevant decisionmakers through the Human Resources Department, but the facts do not support a finding that the Human Resources Department participated in the five hiring decisions for which Rowe attempts a pretext showing or that the Human Resources Department exercised influence or control over the decisionmakers except in another instance (not among the five) when it is acknowledged that it withdrew Rowe's application for a position it determined was beyond her medical restriction.

It is one thing for Rowe to maintain that the Human Resources Department should have proactively intervened on her behalf when nursing positions opened, but it is another to say that the hiring decisionmakers rejected Rowe's applications based on their own discriminatory or retaliatory feelings or based on false statements fed to them by someone who harbored

discriminatory or retaliatory animus toward Rowe.  The Human Resources Department's knowledge of any protected activity cannot be transferred to the individual decisionmakers on the limited showing Rowe offers.

**B.      _Disability discrimination / accommodation-related retaliation_**

The discrimination/retaliation theories are discussed with respect to the five positions for which Rowe says she has adduced evidence of pretext:  (1) Phlebotomist, ARG Lab/Chemistry;  (2) RN, HHS Surgical Services (07-1941[13]);  (3) RN, Horizons Cardiology;  (4) Nurse Educator, Infection Control;  and (5) I.S. Clinical Educator.

> In a failure-to-promote claim, the plaintiff establishes a prima facie case by showing that (1) she is a member of a protected class, (2) she was qualified for an open position for which she applied, (3) she was rejected, and (4) someone possessing similar qualifications filled the position instead.  If a prima facie case is made out, an inference of intentional discrimination is raised, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision(s).  If the employer does so, the burden of production reverts to the plaintiff, who then must prove that the employer's neutral reasons were actually a pretext for the alleged discrimination.

Ingram v. Brink's, Inc., 414 F.3d 222, 230 (1st Cir. 2005) (citations omitted).  None of these five positions requires an analysis of Rowe's qualifications / ability to perform essential functions.  The Aroostook Medical Center does not contest Rowe's ability to make out a prima facie case with respect to these positions.  The issue for discussion is pretext.

To meet her summary judgment burden, Rowe must "identify a genuine issue of material fact with respect to whether the employer's stated reason . . . was a pretext for a proscribed type of discrimination."  Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004).  To do this, she must adduce evidence that the decisionmaker's articulated explanation is false and that

---

[13]      Rowe does not assert pretext in her memorandum with regard to her June application for RN, HHS Surgical Services (07-1219).

discriminatory animus can reasonably be inferred from the employer's dissembling. <u>Boyajian v. Starbucks Corp.</u>, 587 F. Supp. 2d 295, 304 (D. Me. 2008); <u>Dykstra v. First Student, Inc.</u>, 324 F. Supp. 2d 54, 63 & n.12 (D. Me. 2004). The question is whether a trier of fact can reasonably infer from a given falsehood that the employer is attempting to cover up an illegal discriminatory motive. <u>Reeves v. Sanderson Plumbing</u>, 530 U.S. 133, 147 (2000); <u>Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico</u>, 404 F.3d 42, 44 (1st Cir. 2005). A pretext showing can be based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation, <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56 (1st Cir. 2000), but these attributes must be sufficient to enable the trier of fact to find not only that the explanation is likely false, but also that the explanation is offered to cover up an illegal discriminatory motive. <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 824 (1st Cir. 1991); <u>Boyajian</u>, 587 F. Supp. 2d at 305. The issue calls for an objective evaluation of the decisionmaker's perception and whether the decisionmaker believed his or her explanation. <u>Mesnick</u>, 950 F.2d at 824; <u>Boyajian</u>, 587 F. Supp. 2d at 305. Where the relative qualifications of job applicants are concerned, the applicant's personal assessment of her own qualifications will not suffice to demonstrate discriminatory motive. <u>Cruz-Ramos v. P.R. Sun Oil Co.</u>, 202 F.3d 381, 385 n.3 (1st Cir. 2000); <u>Boyajian</u>, 587 F. Supp. 2d at 305.

     *1.  Phlebotomist*

     With respect to the Phlebotomist position, the decisionmaker was Cherri Fitzpatrick, Senior Manager for Pathology Services. (DSMF ¶ 116.) Ms. Fitzpatrick attests to her lack of knowledge concerning Rowe's protected status, including any knowledge that Rowe had a physical restriction. (<u>Id.</u> ¶¶ 122-123.) Rowe fails to present any evidence indicating that Ms. Fitzpatrick knew of her protected status as a disabled person or as a whistleblower, which rules

out a showing of discriminatory animus.  Moreover, Rowe sought this position in August 2007, two months prior to filing her charge of discrimination with the Maine Human Rights Commission.

##### *2.  RN, HHS Surgical Services (07-1941)*

With respect to RN, HHS Surgical Services (07-1941), the decisionmaker was Kathy Lancaster, Senior Manager for Cardiology Services, Surgical Services & Outpatient Lab at Horizons.  (Id. ¶¶ 143, 109.)  Ms. Lancaster attests to a lack of knowledge concerning any whistleblower activity on Rowe's part (id. ¶ 148), but does not similarly attest to lack of knowledge concerning Rowe's disability, unlike Ms. Fitzpatrick.  Knowledge of disability status is inferred because the Aroostook Medical Center does not dispute that Ms. Lancaster knew of Rowe's status.  Rowe sought this position in August 2007, two months prior to filing her charge of discrimination with the Maine Human Rights Commission.

Kathy Lancaster attests that there were twelve applicants to this position, including Rowe, but that she interviewed only four, not including Rowe.  She gave the position to an outside candidate who had prior surgical office experience and had assisted with surgical office procedures.  (DSMF ¶¶ 145-146.)  She says that the candidate also had excellent customer service skills.  (Id. ¶ 146.)  Lancaster explains that she did not interview Rowe because Rowe lacked "specialty office experience" and had only "fair" customer service skills.  (Id. ¶ 147.) Rowe responds that she had already trained for work in this very surgical office, had experience caring for post-surgical patients and had been evaluated at the Aroostook Medical Center as having excellent customer service skills.  (POS ¶ 147.)  Rowe also attests that she received notice from Human Resources that her application was rejected the day after she submitted it.  (POS ¶146.)

Rowe's affidavit testimony is insufficient to generate a genuine issue of material fact as to pretext or as to the existence of animus against her due to the presence of a disability.  Although Rowe's affidavit suggests that she was an adequate applicant, it does not suggest that the successful candidate was not a better candidate from an objective standpoint.  Additionally, the fact that Rowe received notice that her application was rejected the day after she submitted it does not call for an inference that Ms. Lancaster did not actually consider Rowe's application and relative qualifications.  A review of the cited portion of the Umphrey Deposition (Doc. No. 20-2) reflects that human resources plays a part in processing job postings for departmental heads and, in some cases, may screen out applicants.[14]  Whether that happened in this instance, so that Ms. Lancaster never actually considered Rowe's application, is not something that can reliably be inferred from Umphrey's testimony about general practices or the timing of any notification Rowe may have received in this instance.  I note that Rowe does not appear to have deposed Ms. Lancaster or any of the other decisionmakers in this case.  At least no deposition of any decisionmaker appears in the summary judgment record.  Nor has Ms. Rowe presented any documents in support of her claim that she was the best qualified applicant.  With the exception of one limited reference to the deposition of Human Resources Director Umphrey, Rowe relies exclusively on her own affidavit, her counsel's affidavit, and the Maine Human Rights Commission Investigative Report in support of her Opposing Statement and her Additional Statement.  None of these record sources exposes as pretext Ms. Lancaster's declaration that she considered and passed over Rowe in favor of others she regarded as better applicants.  At most, Rowe makes a weak case of pretext, inviting suspicion that she may not have been considered

---

[14] It appears that the proper citation to the Umphrey Deposition is page 12, lines 4-24, rather than page 11.

for the position, for one reason or another, but not inviting a reliable inference that her qualifications actually were not considered by Lancaster, let alone a reliable inference that Lancaster disregarded her specifically because of prejudice toward the disabled or toward someone who had sought accommodation in the past.

### 3. RN, Horizons Cardiology

With respect to RN, Horizons Cardiology, Ms. Lancaster was once again the decisionmaker and Rowe was not granted an interview. (DSMF ¶ 156; PAS ¶ 64.) Ms. Lancaster relates that she hired the applicant who had been her second favorite interviewee for the Horizons Surgical Services position, previously discussed. She explains that the successful applicant was a 20-year employee of the Aroostook Medical Center, had past experience as a paramedic and emergency room experience, and excellent customer service skills. Ms. Lancaster says she considered the applicant a "perfect fit" for the position and reports that she did not interview anyone else. (DSMF ¶¶ 155-161.) Rowe's attestation that Lancaster reported passing over her because she lacked specialty office experience does not support a finding that Lancaster's preference for the successful applicant was not genuine or is a pretext designed to hide animosity toward the disabled.

Rowe sought this position in October 2007, the same month that she filed her charge of discrimination with the Maine Human Rights Commission. The record does not divulge which came first or what knowledge Ms. Lancaster had of the administrative filing.

### 4. Nurse Educator, Infection Control

With respect to Nurse Educator, Infection Control, the decisionmaker was Tammy Beaulier-Fuller, then Senior Manager of Quality, Infection Prevention & Employee Health. (Id. ¶ 164; Beaulier-Fuller Decl. ¶ 1, Doc. No. 26.) Like Ms. Lancaster, Ms. Beaulier-Fuller attests

to a lack of knowledge regarding whistleblower activity, but not to a lack of knowledge concerning Rowe's disability status. (Id. ¶ 85.)

Tammy Beaulier-Fuller reports that she was not aware of Rowe's application for this position because she never checked to see if any online applications were submitted. (DSMF ¶¶ 163-168.) Ms. Beaulier-Fuller also attests that she interviewed only one of the five applicants whose materials she reviewed. Rowe says that Ms. Beaulier-Fuller's representation about not checking for online applications is not credible on its face, asserting that Ms. Beaulier-Fuller certainly understands that there is an on-line application process at the Aroostook Medical Center. (POS ¶ 167.) A reasonable person might harbor suspicion about such a representation. However, a suspicion does not justify an inferential finding of discriminatory animus. None of the evidence demonstrates that Ms. Beaulier-Fuller did not, in fact, simply neglect to check for online applicants, as she attests. It does not appear that Rowe ever deposed Ms. Beaulier-Fuller.

Rowe sought this position in February 2008, four months after filing her charge of discrimination with the Maine Human Rights Commission. However, there is no indication whether Ms. Beaulieu-Fuller had knowledge of the filing.

### 5. I.S. Clinical Educator

With respect to I.S. Clinical Educator, the decisionmaker was Rick Frank, Director of Management Information Systems. (Id. ¶ 170.) Mr. Frank attests to a lack of knowledge regarding whistleblower activity, but not to a lack of knowledge concerning Rowe's disability status. (Id. ¶ 177.) Rick Frank interviewed Rowe and the two other applicants for this position and he attests that Rowe did not perform as well in the peer interview process as the individual chosen to fill the position. Mr. Frank also attests that Rowe's past work in the department demonstrated a recurring issue with lack of organizational skills when teaching classes. (DSMF

¶¶ 172-173.) Rowe responds that she and the other applicants all received the same score in a peer review for organizational skills. She also indicates that she received "satisfactory" performance evaluations for her past work in the I.S. Department. (POS ¶ 173.) A satisfactory overall performance evaluation and the same peer-review score for organizational skills does not render false Mr. Frank's personal assessment that Rowe previously demonstrated shortcomings in organization skills while teaching classes. Nor does it support a reliable inference that Mr. Frank harbored animosity toward Rowe based on her non-disqualifying disability or disability-related advocacy.

According to Mr. Frank, Kim Smith, one of the supervisors in the department who participated in the hiring process, told him that Rowe had expressed unhappiness with the Aroostook Medical Center and an intention to move to Connecticut. Mr. Frank offers this hearsay statement to explain that, in addition to the factors already addressed, he did not wish to hire and train someone who would not remain for long. (DSMF ¶¶ 174-175.) Rowe denies ever stating to Ms. Smith that she was unhappy at the Aroostook Medical Center or that she intended to move away. (DSMF ¶ 175.) Rowe's affidavit creates an issue as to whether she said these things to Ms. Smith, but it does not suffice to support a finding that she was the best candidate for the position or that she performed the best in the peer interview process. Nor does this limited showing raise a genuine issue of material fact that Mr. Frank hired someone other than Rowe based on disability-related bias against Rowe.

## CONCLUSION

For the reasons set forth in the preceding discussion, I recommend that the Court GRANT the Aroostook Medical Center Motion for Summary Judgment (Doc. No. 19) with respect to Rowe's discriminatory / retaliatory failure to hire claims and DENY the motion with

respect to Rowe's claim that the Aroostook Medical Center failed to reasonably accommodate her disability.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 17, 2010